UNITED STATES of America,
Plaintiff-Appellee,

v.

Kenneth ANDERSON and John Marine,
Defendants-Appellants.

Nos. 85–1651, 85–1686.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 25, 1985.

Decided Jan. 9, 1987.

William H. Theis, Chicago, Ill., for defendants-appellants.

William Gummeil, Asst. U.S. Atty., Gregory A. Vega, U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Before BAUER, Chief Judge, WOOD, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Appellants appeal from their convictions on several federal criminal counts based on allegations that they accepted bribes to arrange favorable dispositions of alcohol-related driving offenses in Indiana. John Marine, an official at the Lake County County Court in Crown Point, Indiana, and Kenneth Anderson, a barber in Crown Point, were charged and convicted on one count of mail fraud, 18 U.S.C. § 1341; three counts of violating the Hobbs Act, 18 U.S.C. § 1951, by extortion affecting interstate commerce; and one RICO count, 18 U.S.C. § 1962(c), which charged the two with twelve incidents of bribery. Each count charged appellants under the substantive statute and under 18 U.S.C. § 2, which makes one who aids and abets an offense against the United States liable as a principal. Marine was additionally charged with conspiracy to violate the RICO statute, 18 U.S.C. § 1962(d), and with tax evasion, 26 U.S.C. § 7201. On the former he was convicted and on the latter he was convicted of the lesser included offense of filing a false return. We have jurisdiction under 28 U.S.C. § 1291.

Appellants contend that the mail fraud conviction cannot stand because the use of the mails was not in furtherance of the scheme and that the Hobbs Act convictions cannot stand because the requisite effect on interstate commerce is lacking. Marine claims also that the evidence of his involvement in the incidents of bribery is insufficient to uphold the RICO and Hobbs Act convictions. He further asserts that the tax evasion count should not have been joined with the other counts because it involved income in addition to the bribery proceeds. We will affirm on all counts.

## I.

During the time of the events resulting in this case, Kenneth Anderson was a barber in Crown Point, Indiana. John Marine worked at Division 1 of the Lake County County Court in Crown Point, progressing from bailiff to probation officer to case coordinator to office manager. In each position he had free access to case files.

Anderson received a telephone call from a "Dan Mingo" and an unidentified informant on July 16, 1982. Unbeknownst to Anderson, Mingo was an undercover agent of the Indiana State Police named Gerald J. Hole. Mingo had received a fabricated ticket for driving under the influence of alcohol and improper lane usage. An FBI agent had posted bond for him. Mingo told Anderson of his plight and was told to come to the barber shop. There, Anderson and Mingo agreed on a price of $1,600 to fix the ticket and Mingo paid $200. Mingo taped each of his subsequent meetings with Anderson. Anderson's phone was also tapped.

Mingo visited Anderson again on July 21 and gave him the balance of $1,400 in a blue envelope. Anderson assured him that the ticket would be fixed without Mingo needing to appear in court. Anderson said also that the person who fixed tickets for him in the court was going to come to the shop that day. After Mingo left, Marine came to the shop and left with a blue envelope sticking out of his shirt pocket.

The ticket was not fixed, however, and a bench warrant was issued as a result of Mingo's failure to appear in court. He arranged once more to be arrested and posted a $1,000 bond. He then visited Anderson and complained angrily, demanding both that the charge be fixed and that he receive his $1,000 bond back. Anderson phoned Marine, who said that a computer error was to blame. He assured Anderson that the charge was no longer in the computer and that Mingo would receive his bond money back. Mingo asked Anderson to have the check mailed to him at a specified address. It was.

Mingo also asked Anderson to take care of a drunken driving ticket for "Richard Ryan," an undercover FBI agent. Mingo paid Anderson $1,600 cash at the barber shop. After Mingo left, Anderson phoned Marine and told him that he had something for him. Marine agreed to come soon. Ryan did not go to court and a bench warrant was also issued in his case.

Marine and Anderson were also charged in the RICO and Hobbs Act counts with ten other incidents of bribery, none of which involved fabricated arrests. Discussion of the relevant evidence appears below.

## II.

### RICO

Marine argues that there was insufficient evidence of his involvement in the charged predicate acts to sustain his RICO conviction. To prove a RICO violation, the government must prove that the defendant committed two predicate acts. The indictment alleged that each appellant committed twelve predicate acts of bribery. Four of those acts served also as the bases for the three Hobbs Act counts and the mail fraud counts. The jury convicted on each of those four counts. The remaining eight bribery acts were alleged only as predicate acts under RICO.

Marine argues that due to the manner in which the jury was instructed, the conviction can be upheld only if there was sufficient evidence as to every one of the twelve

alleged predicate acts. The judge gave a "two-is-enough" instruction, instructing the jury to convict on the RICO count if it found beyond a reasonable doubt that defendants had committed any two of the twelve predicate acts alleged. By analogy to *United States v. Berardi*, 675 F.2d 894 (7th Cir.1982), Marine argues that because it is impossible to determine upon which two acts the jury based its verdict, the conviction can stand only if evidence was adduced sufficient to support a finding that Marine committed each of the twelve acts alleged.

In *Berardi*, the defendant was charged, in a single count of obstruction of justice, with three separate acts of obstruction. The trial court gave a "one-is-enough" instruction, telling the jury that it should return a verdict of guilty if it found that the defendant had committed any of the three acts charged. This court held that because such a procedure made it impossible to tell which act was the basis of the guilty verdict, the conviction could be affirmed only if there was sufficient evidence to support a finding that Berardi had committed each of the three acts of obstruction charged. Otherwise, the possibility existed that the jury had based its verdict on an act as to which the evidence was insufficient.

In this case, the government argues that because Marine did not properly object to the "two-is-enough" instruction at trial, the question is whether giving the instruction was plain error. This misconceives the issue. Marine does not assert that giving the instruction was error, he argues rather that giving the instruction has the consequence that the court reviewing the conviction must determine whether there was sufficient evidence to support a finding as to each predicate act alleged.

██ The danger underlying the *Berardi* rule, however, is not present in this case. The jury convicted on each of the four substantive counts which were also alleged under RICO as predicate acts. A finding as to any two of the four was sufficient to support the RICO convictions. The danger in *Berardi*, that review would not rest upon an act that the jury had found the defendant guilty of, is not present here. The jury unanimously found appellants guilty of each of the four acts which form the basis for review. It is true that it cannot be said for certain which of the four substantively charged acts the jury relied on for the RICO convictions. But under these circumstances the jury could properly rely on any two or more of the four substantively charged offenses as a matter of law.

The fact that the jury returned a guilty verdict on the RICO conviction implies that it found that two predicate acts were committed in the conduct of an "enterprise," Division 1 of the Lake County County Court. The jury also returned guilty verdicts on each of the four substantive counts which were also alleged as predicate acts. A finding as to any two of the four would have met the RICO requirement of two predicate acts. For the jury to reject the four substantively charged acts as predicate acts for the RICO count and to rely on two of the other eight alleged predicate acts of bribery would be irrational under the facts of this case. Thus, the *Berardi* rule is inapplicable. The twelve alleged predicate acts were essentially fungible allegations of ticket fixing. As discussed below, conviction on two of the Hobbs Act counts depended on the jury inferring that Anderson and Marine had executed an ongoing plan to obtain bribes for fixing tickets. An element of the mail fraud conviction was that the two were engaged in a "scheme." In this case then, since we find that the evidence is sufficient to support a finding that Marine committed each of the substantively charged predicate acts, the RICO conviction stands. This holding is consonant with *United States v. Peacock*, 654 F.2d 339, 348 (5th Cir.1981), *cert. denied*, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983), and *United States v. Weisman*, 624 F.2d 1118, 1124 (2nd Cir. 1980) ("[T]he jury could not have rationally concluded that the conspiracies to commit bankruptcy and securities fraud occurred in the conduct of the Theatre's affairs with-

out also finding that the substantive offenses carried out in the course of the conspiracies also took place in the conduct of the Theatre's affairs.")

As *Berardi* has no force under the facts presented here, we do not decide the question of the applicability of that rule in the RICO context. Nor are we faced with the question that would arise if the evidence was sufficient only as to some of the substantively charged acts. *Cf. United States v. Brown,* 583 F.2d 659, 669 (3rd Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). (RICO conviction reversed where impossible to determine whether jury relied on two acts of mail fraud which were reversed on appeal).

■  Before considering the evidence, we also reject Marine's argument that, under Federal Rule of Evidence 404(b), evidence of his acts performed in connection with some of the bribery incidents cannot be considered against him in regard to the other incidents. Under Rule 404(b),

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence of Marine's participation in one bribery incident may not serve to show that he had an inherent propensity toward corruption and therefore participated in a different bribery incident. But it can support an inference that Marine and Anderson had a plan and that Marine acted in conformity with the plan. *See United States v. Murphy,* 768 F.2d 1518, 1535 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986) (evidence of bribes received on other occasions admissible to show common plan).

■  Having resolved the two preliminary issues, we now consider the sufficiency of the evidence to support a finding that Marine was guilty of each of the four predicate acts that were also the subject of substantive counts. These incidents involved bribes from Ralph Mulvihill, Dan Mingo, Leonard Tengblad and James Terpstra. Marine does not dispute that the evidence was sufficient as to the first bribe. Mulvihill testified that, after Mulvihill had agreed with Anderson to pay to have his ticket fixed, Marine came to Anderson's barber shop and accepted the payment from Mulvihill. Mulvihill subsequently received his driver's license and bond refund in the mail, without appearing in court.

■  The evidence of Marine's involvement in the Mingo bribe is also clearly sufficient. Mingo visited Anderson's shop and gave him a blue envelope containing $1,400 of the $1,600 price. Anderson mentioned that he was expecting his influential contact in the court to arrive at the shop that day. That afternoon, Marine came and left with a newly acquired blue envelope in his pocket. Subsequently, when Mingo was arrested for failure to appear, Anderson phoned Marine, who saw to it that the original ticket was expunged from the computer and that Mingo received refund of his bond.

Evidence of Marine's involvement in the Tengblad and Terpsta bribes is less direct. Both Tengblad and Terpstra paid Anderson, went to court, and received light sentences. Neither had contact with Marine. Anderson accompanied Tengblad to court and showed him where to sit. Tengblad was approached by the prosecutor, who said that he did not know who Tengblad knew, but Tengblad must know someone. The prosecutor then determined that six months probation would be an acceptable sentence from Tengblad's point of view. Tengblad received that sentence. Terpstra received a small fine.

■  Standing alone, the Terpstra and Tengblad incidents do not implicate Marine. But when viewed in light of all the evidence, the jury had a sufficient basis to infer that Anderson and Marine had a plan, pursuant to which Anderson would be responsible for arranging with defendants

that they pay him to get their tickets fixed and Marine would be responsible for using his position to obtain favorable dispositions, sometimes by directly removing the tickets from the court's records, sometimes by interceding with the judge and prosecutor. The jury had sufficient evidence to arrive at a reasonable inference that Marine acted in accordance with this plan in the Tengblad and Terpstra incidents.

Anderson and Marine's close cooperation in the Mulvihill and Mingo incidents recurs in the evidence of the other incidents. In a phone conversation, Anderson and Marine discussed how much they should charge Michael Schest to have his tickets removed from the record. After Mingo paid Anderson to fix a ticket for "Richard Ryan," Anderson phoned Marine and told him he had something for him. Marine agreed to come soon. In other incidents, Anderson accompanied defendants to their court hearings after they had agreed to pay him and introduced them to Marine.

The inference that Marine was Anderson's man in the courthouse in the Terpstra and Tengblad incidents draws support also from Marine's testimony that, in cases other than those charged, he had spoken with the judge and prosecutor and obtained favorable dispositions of cases, notwithstanding the fact that he testified that he had not done so in return for money.

### III.

### Hobbs Act

■ Appellants argue that the government did not show a sufficient effect on interstate commerce to support a Hobbs Act conviction. The Hobbs Act applies to conduct that "in any way or degree obstructs, delays, or affects [interstate commerce] or the movement of any article or commodity in [interstate commerce]." 18 U.S.C.A. § 1951(a) (1984). The Supreme Court has interpreted this language to mean that the Hobbs Act reaches to the limits of the Commerce Clause. *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Thus, the act reaches

conduct where the effect on interstate commerce is slight and where there is no actual effect proved but there is a realistic probability of an effect. *United States v. Glynn*, 627 F.2d 39, 41 (7th Cir.1980), *see also United States v. Boulahanis*, 677 F.2d 586 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982) (requisite quantum of effect where the fact that a social club paid extortion money meant that it had less funds from which to spend its customary $68 per month on coffee from out of state); *United States v. Murphy*, 768 F.2d 1518, 1530–31 (7th Cir. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986) (sufficient effect where payment of bribes left lawyers less money to spend on envelopes, stationery, and law books from out of state).

■ In this case, the government brought charges under the Hobbs Act in connection with the bribes to fix tickets for three truck drivers. Each driver had transported articles across state lines in the past and planned to do so in the future, although one driver was unemployed. The fact that a truck driver is able to pay a bribe to obtain a favorable disposition on a ticket for driving under the influence of alcohol increases the probability that he will be able to drive in the future. Thus, the bribery was likely to have a direct effect on interstate commerce. Only a "realistic probability of a nexus ... between the extortionate conduct and interstate commerce" is required. *United States v. Mattson*, 671 F.2d 1020, 1024 (7th Cir. 1982). The government cites *United States v. Kuta*, 518 F.2d 947 (7th Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975) for the proposition that the beneficial effect on interstate commerce suffices for the Hobbs Act where the conduct facilitated the flow of building material across state lines. Because the three drivers in this case were able to have their drunken driving tickets fixed, they were substantially more likely to take part in interstate commerce, although one might hesitate to describe that effect as beneficial.

## IV.

### Mail Fraud

Appellants also attack the mail fraud conviction, on the basis that the mailing of Mingo's bond refund check was not in furtherance of the scheme. Anyone who, "having devised or intending to devise any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice or attempting so to do, [uses the mails]" commits mail fraud. 18 U.S.C. § 1341. Appellants argue that the mailing in this case was not in furtherance of the scheme because it was not necessary to the fixing of Mingo's ticket. Such an argument views too narrowly the acts that can be said to be in furtherance of the scheme.

■ The scheme was a continuing operation to make money through the regular fixing of tickets in the Lake County County Court. In Mingo's case, a mundane transaction had gone awry. A "client" of the operation complained that the service for which he had paid had not been performed. After being told that his ticket was fixed, he had been arrested for failure to appear at the hearing on the ticket and forced to post a $1,000 bond. Anderson contacted his partner and related the news. Marine resolved the glitch and had the $1,000 refund check sent to Mingo.

The mailing of the check served the purposes of the scheme in several ways. Most obviously, it completed the transaction with Mingo. Appellants argue that the fixing of the ticket was all that mattered to Mingo. If $1,000 was a matter of indifference to him, they were surely modest in charging only $1,600 to fix his ticket. The return of the refund served also as a message to Mingo that this time his legal difficulties had indeed been cleared away, providing a proof of the expungment that oral assurances, having earlier proved false, would not have had. Assuring Mingo's satisfaction was important for two reasons. First, he could have gone to the authorities. Second, he had already referred one drunk driver to Anderson and might have sent more. Several of the defendants who paid

Anderson had been referred to him by earlier state defendants who had themselves paid bribes to him.

The mailing of the refund check to Mingo also "facilitated concealment of the scheme." *United States v. Wormick,* 709 F.2d 454, 462 (7th Cir.1983) (mailing of car rental invoice necessary to keep insurer from becoming suspicious). Anderson and Marine took certain precautions to hide their illegal activity. Anderson did not reveal to most defendants the identity of his contact in the court. On the telephone, the two tried, if unsuccessfully, to avoid incriminating statements by speaking in vague terms. The return of the check kept Mingo from going to the court and inquiring about his money, which could have led to further inquiry. Moreover, the bond had to be returned in order to keep the court's records accurate. Anderson and Marine could simply have cashed the check themselves, but that would have introduced completely new risks to the scheme.

An analogous case is *United States v. Otto,* 742 F.2d 104 (3d Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985). In *Otto,* the mail fraud conviction was based upon a letter to an investor who had been a victim of the scheme. Although the defendant had already gotten money from that particular investor, the letter served the overall scheme by gaining time for the defendant and keeping attention from being drawn to the scheme, while defendant continued to solicit further victims. The Supreme Court has recently applied the "lulling letter" rationale. *United States v. Lane,* —— U.S. ——, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986). In the present case, the mailing similarly served to prevent unwanted attention being focussed on Anderson and Marine as they continued their activities.

■ A more troubling argument is that Mingo, by requesting that the check be mailed to him, manufactured federal jurisdiction. In *United States v. Archer,* 486 F.2d 670 (2nd Cir.1973), the court refused to find that the Travel Act was applicable to a "sting" operation where the telephone

calls proposed as the necessary federal element were made at the behest of undercover agents, solely to make the case a federal offense. We do not find the analogy to *Archer* on target here. We note first that the *Archer* court felt that the reach of the Travel Act "was not to be stretched to the limits of its language," 486 F.2d at 680, because the Act was targeted "primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities in another." *Id., quoting Rewis v. United States,* 401 U.S. 808, 811, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). The mail fraud statute, by contrast, has been interpreted very broadly to reach use of the mails in aid of fraudulent schemes. *See, e.g., United States v. Galloway,* 664 F.2d 161, 166 (7th Cir.1981) (Cudahy, J., concurring) ("the link is not so tenuous as to avoid the judicially hypertrophied reach of this far-ranging statute"). Moreover, the *Archer* court made clear that it interpreted the Travel Act narrowly partly because of the intrusive use of federal power in that case, in which federal agents deceived the state's police, courts, and grand jury. 486 F.2d at 672. In this case, the federal agents worked in conjunction with state authorities.

More importantly, the artificial measures that the federal agents in *Archer* employed to manufacture federal jurisdiction are not mirrored in this case. In *Archer,* federal agents crossed over to Newark from New York solely to ensure that telephone calls made would be interstate calls. They prompted the defendant to call and leave a message for one agent with the operator at a Las Vegas hotel for the same reason, although the agent was not in Las Vegas. The court also rejected a call from Paris because it "served no purpose that would not have been equally served by a call from New York." In the present case, although Mingo did prompt the use of the mail to return the check, mailing was actually an efficient means to accomplish the task. Because this case does not reflect the sort of labored pretense found in *Archer,* we see no reason to depart from the established broad reach of the mail fraud statute.

## V.

### Joinder of Tax Count

Marine contends also that the count charging him with tax evasion was wrongly joined with the other counts. The tax evasion count was based on his failure to report the income from the Mulvihill bribe, from payments he received indirectly from a traffic school, and from rents paid by tenants at a small motel he owned.

Under Federal Rule of Criminal Procedure 8, joinder of counts is permitted when "the offenses charged ... are based on the same act or transaction ..." The Mulvihill bribe was the foundation of one Hobbs Act count, was a predicate act for the RICO count, and was one of three sources of unreported income for the tax evasion count. Joinder of a tax evasion count is appropriate when it is based upon unreported income flowing directly from the activities which are the subject of the other counts. *United States v. Kenny,* 645 F.2d 1323, 1344 (9th Cir.1981), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981). *See also United States v. Kopituk,* 690 F.2d 1289, 1314 (11th Cir.), *cert. denied,* 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1982) (unreported income and unlawful business deductions stemmed from participation in conspiracy). *Kenny* and *Kopituk* were slightly different from the present case, in that the illicit activities charged in the other counts were the sole sources of the unreported income. But the fact that the bribe was only one of three sources of income in the tax count does not alter the fact that the tax count was based in part on the same transaction which was a basis for one Hobbs Act count and the RICO count.

Moreover, even if joinder had been in error, erroneous misjoinder is reversible only if it results in substantial prejudice to the defendant. *United States v. Lane,* ⸺ U.S. ⸺, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986). The fact that the jury acquit-

ted Marine on tax evasion and convicted him on the lesser included offense of filing a false return tends to negate any possibility that he was prejudiced on the tax count by its joinder with the other counts. Marine, apparently recognizing that, argues instead that he was prejudiced as to the bribery, mail fraud, and racketeering counts by the joinder of the tax evasion count. The evidence of tax evasion supposedly put him in an even worse light than he already was. This curious argument cannot prevail in the face of the clear evidence of his venality.

### VI.

The final issue we address is whether to apply retroactively our decision in *United States v. Spudic*, 795 F.2d 1334 (7th Cir. 1986), which prohibited the use of probation officer sentencing councils. Some district courts regularly consulted with a panel of probation officers before imposing sentence in criminal cases. In *Spudic*, this court prohibited the practice because of "the potential for abuse, its doubtful appearance, and the possible misunderstanding of the *ex parte* process," and remanded the case for resentencing. The trial court in this case employed such a council in sentencing Marine. He argues that *Spudic* compels that he be resentenced. Since Marine was sentenced before our decision in *Spudic*, that would require retroactive application of the rule.[1] Marine did not protest the procedure in the court below or in his briefs here. After *Spudic* was issued we permitted the parties to file supplemental briefs on the issue.

The Supreme Court has spelled out the basic principles of retroactivity in criminal cases:

> [t]he criteria guiding resolution of the [retroactivity] question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the ad-

ministration of justice of a retroactive application of the new standards.

*Solem v. Stumes*, 465 U.S. 638, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984) (quoting *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967)). The Court has applied these factors in deciding whether to apply retroactively a rule designed to insure that improper factors were not considered in sentencing. *Michigan v. Payne*, 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973). *Payne* mandates our holding in this case that the *Spudic* rule is not to be applied retroactively.

The issue in *Payne* was the retroactivity of *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). *Pearce* had involved the sentencing of defendants where they had been convicted at a retrial after successfully appealing the first conviction. To assure that the trial court did not vindictively impose a greater sentence the second time around to punish the defendant for getting his conviction reversed, the Court had held that when the trial court did impose a greater sentence, it must provide reasons based on specific instances of conduct of the defendant after the first sentencing. The *Payne* court, after considering the factors listed above, held that *Pearce* was not to be applied retroactively.

#### A. Purpose to be Served by the New Standards

In *Payne*, the Court relied heavily on the prophylactic nature of the *Pearce* rule in finding that the purpose of the rule favored non-retroactivity. The Court has generally not applied prophylactic rules retroactively. *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) (*Miranda* not applied retroactively); *Solem v. Stumes*, 465 U.S. 638, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984) (refused to apply retroactively *Edwards* rule that once a suspect has invoked his right to counsel, any subsequent conversations

---

1. This court did not apply *Spudic* retroactively in a case where the appellant did not himself claim harm from the use of the sentencing council. *See United States v. Andersson*, 803 F.2d 903, 908 (7th Cir.1986) (Ripple, J., concurring).

must be initiated by him). The *Payne* court gave two reasons for not applying prophylactic rules retroactively. First, "their retrospective application will occasion windfall benefits for some defendants who have suffered no constitutional deprivation." *Payne,* 412 U.S. at 54, 93 S.Ct. at 1970. Second, they do not create a new right, serving rather to safeguard existing rights. Thus, the underlying right remains available as a basis for challenge.

The *Payne* court viewed the *Pearce* rule as a prophylactic rule designed "to ensure that resentencing decisions will not be based on improper considerations." *Id.* at 52–53, 93 S.Ct. at 1969. That aptly describes the rule in the present case. The *Spudic* court stressed the prophylactic nature of its holding; "[W]e do not intend to imply that Judge Moody was guilty of any of the possible abuses." *Spudic,* 795 F.2d at 1343. The court did not find that the use of the sentencing council violated Spudic's rights. Rather, we acted because of "the potential for abuse, its doubtful appearance, and the possible misunderstanding of the *ex parte* process." *Id.* at 1344. As in *Payne,* retroactivity here would require resentencing in many cases in which there is no reason to believe that the court considered improper factors in sentencing. Also as in *Payne,* the *Spudic* rule does not affect the determination of guilt or innocence. It does not invade or in any manner impact the fact finding process of the trial itself.

### B. Reliance

The important issue here is whether courts (*Stovall* spoke of reliance by "law enforcement authorities" but the Court has applied the test also to reliance by courts. *E.g., Payne,* 412 U.S. at 55–56, 93 S.Ct. at 1971.) have justifiably relied on a prior and different rule of law. The rule in *Spudic* does not overrule past precedent, because the issue was one of first impression. However, the new rule is not one that law enforcement authorities should have anticipated. *Payne* at 55, 93 S.Ct. at 1971. Because judges had not been bound by a rule in the use of such sentencing councils and because the new rule was not "foreshadowed" by higher court decisions, judicial reliance on the preexisting rule was reasonable. We decline to find that trial courts should have anticipated our prohibition of the practice.

### C. Effect on the Administration of Justice

The United States Attorney has submitted figures indicating that there are probably 125 prisoners presently incarcerated who were sentenced in the Northern District of Indiana with the aid of a probation officer sentencing council. Resentencing all who collaterally attacked their sentence would clearly burden and disrupt the court system. In some cases, the sentencing was years ago. Prisoners could request an updated presentence investigation. Resentencing would, as in *Payne,* require reconsideration of sentences that were meted out long ago, with the accompanying problems of imperfect records and memories.

The close similarity of *Payne* to this case compels our conclusion that *United States v. Spudic,* 795 F.2d 1334 (7th Cir.1986), is not to be applied retroactively.

### VII.

For the reasons stated, Marine and Anderson's convictions are

AFFIRMED.