**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Edward EMOND and Maxine Emond,**
**Defendants–Appellants.**

**Nos. 89–2993, 89–2994 and 90–2220.**

United States Court of Appeals,
Seventh Circuit.

Argued March 1, 1991.

Decided July 1, 1991.

Rehearing and Rehearing In Banc
Denied July 31, 1991.

**1512**

John E. Farrell, Crim. Div., Barry R. Elden, Francis C. Lipuma, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Sharon G. Kramer, Chicago, Ill., for defendants-appellants.

Before POSNER, FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

When Edward Emond was hired to manage the Village of Streamwood it was an ordinary Illinois municipal corporation. When he left, it was a RICO enterprise. The evidence at his two trials showed that Edward used his official position as Streamwood's village manager to extort money from persons with business before the village government, and engaged in a separate scheme to defraud the government of the local county. Edward and his wife Maxine Emond failed to report the income they derived from these schemes, as well as other income, on their federal income tax returns. In two trials, Edward was convicted of a variety of crimes growing out of his official misconduct and other misdeeds. Edward's wife Maxine was tried with her husband in his first trial, and was convicted of tax evasion. Edward appeals his convictions in both trials. Maxine appeals her convictions in the first trial. We affirm the convictions.

## I. FACTS AND PRIOR PROCEEDINGS

Through the middle 1980s, Edward Emond was the village manager of Streamwood, Illinois, a northwestern suburb of Chicago. Edward used his position for personal enrichment by soliciting bribes from individuals seeking to do business with the village government. In one incident, Edward was approached by two men, Raymond Seifert and Earl Mink, who owned a used-car lot in Streamwood called Easy Auto. After selling their land to a convenience store owner, Seifert and Mink sought to purchase an adjacent unimproved lot owned by the village. The village offered to sell the land at its assessed value, $57,000, but Seifert and Mink thought that was too much to pay. Edward offered to persuade the village board to reduce the price to $37,500, and to throw in tree removal and grading, in exchange for a $10,000 bribe. The proposed sale hit a snag when Village Attorney Jay Crane advised Edward that it would violate an Illinois statute requiring sales of municipal land to be at no less than 80 percent of appraised value. Edward eliminated the problem by having the land reappraised at $43,000, thereby allowing the sale at $37,500 to proceed.

Another of Edward's deals involved John Rock and Patrick Custardo, real-estate developers who were interested in building a retirement community in Streamwood to be called Park Villas. Edward solicited a bribe from the two men, telling them that he needed the money to ensure that the project would be approved by the members of the village board. He also demanded a share of any revenues derived from the project. Rock and Custardo acceded to Edward's request, paying him $5,000.

In a third scheme, Edward demanded that Village Attorney Crane and Crane's law partner Eugene Armentrout pay him off in return for continuing to receive the village's legal work. While Crane refused to comply with Edward's wishes, Armentrout and Nick Cetwinski, another lawyer who performed legal work for the village, were more easily convinced. Cetwinski, who did labor relations work for Streamwood, billed Armentrout's firm, which passed along Cetwinski's bills to the village. Edward and Armentrout told Cetwinski to inflate the bills he submitted and to kick back to them the difference between the inflated bills and the true amount he was owed. He complied, paying Edward over $1,200. When Edward later

sensed that he was under investigation, he instructed Cetwinski, who by this point had begun to cooperate with the federal investigation of Edward's activities, to help him create a phony paper trail to account for the inflated bills and kickbacks.

In the last of his ventures, Edward broadened his horizons to include another target for graft, the government of Cook County. With the help of Joe Matalone, a county administrator responsible for overseeing logistical preparations for county elections, Edward began to participate in a scheme to profit from the county's need for cars to transport voting equipment repairers between polling stations. The actual supplier of cars the county leased was Econo–Car. Matalone, however, did not deal with Econo–Car directly, but rather arranged to use intermediaries. Econo–Car would send its invoices to these intermediaries, one of which was Cars–R–Us, a shell corporation controlled by Edward. Cars–R–Us, along with other dummy rental companies owned by other participants in the scheme, would then inflate the bills it received from Econo–Car and invoice the county for the inflated charges, pocketing the difference between what the county paid them and what they paid Econo–Car. They shared the overcharges with Matalone.

All these schemes generated income for Edward, but the great majority of this income went unreported on the federal income tax returns he and his wife Maxine filed with the Internal Revenue Service. The Emonds also failed to report income derived from legitimate sources, including real-estate rentals, the sale of a home, and investments.

In March 1989 a federal grand jury handed down a 46–count indictment against Edward and Maxine, as well as the people from whom Edward received bribes and the other participants in the scheme to defraud Cook County. Edward was indicted for engaging in a pattern of racketeering activities in violation of RICO, 18 U.S.C. §§ 1961–1968, as well as numerous acts of mail fraud, 18 U.S.C. § 1341, and violations of the Hobbs Act, 18 U.S.C. § 1951. He was also charged with one count of obstructing justice, 18 U.S.C. § 1503. In addition, he and his wife Maxine were charged with five counts of tax evasion, 26 U.S.C. § 7206(1), corresponding to their federal income tax returns for the years 1982 through 1986. Most of the people indicted with Edward and Maxine pled guilty and testified against Edward at trial. The only ones that did not were the two owners of Easy Auto, Raymond Seifert and Earl Mink, and the Cook County administrator, Joe Matalone.

Before trial, each of the five defendants moved for a severance. The district court granted Matalone's motion and granted Edward's motion in part, deciding that all charges relating to the Cars–R–Us scheme would be decided separately in a second proceeding involving only Edward and Matalone. It denied Maxine's severance motion, and she proceeded to trial on the tax charges in the same proceeding in which Edward, Seifert, and Mink were tried on the various charges arising from the Easy Auto scheme, and Edward was tried for his role in the Park Villas scheme, the kickbacks from Cetwinski, and the attempt to extort Crane.

In the first trial, the jury found Maxine guilty on all the counts of tax evasion with which she was charged. It also found Edward guilty on all charges save one count of attempted extortion. The district court sentenced Edward to six years in prison on the RICO count and to two consecutive three-year sentences on the mail fraud, Hobbs Act, and obstruction of justice charges, to be served concurrently with the RICO sentence. It also imposed a $25,000 fine. The district court sentenced Maxine to 60 days in a work release program and five years of probation. Edward fared no better in his second trial, in which he was convicted on all of the five counts of mail fraud charged. The district court sentenced him to an additional two years as well as another $25,000 fine.

## II. SEVERANCE: EDWARD/SEIFERT

■ The first ground Edward raises on appeal concerns the district court's refusal

to grant him a severance so that he and Raymond Seifert, one of the owners of Easy Auto, could be tried separately. According to Edward, Seifert's defense was that Edward coerced him into making the $10,000 bribe by threatening him with retaliation if he did not comply with Edward's demands. This defense, Edward argues, was antagonistic to his defense theory. The government responds that Seifert never fully developed the defense Edward ascribes to him, and that Seifert's efforts to shift the blame to Edward never rose beyond finger-pointing of the kind and degree this Court has held does not warrant a severance.

" 'A district court's ruling on a ... severance motion will be overturned only upon a showing of abuse of discretion.' " *United States v. Gonzalez*, 933 F.2d 417, 422 (7th Cir.1991) (quoting *United States v. Moya–Gomez*, 860 F.2d 706, 754 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989)); *see also United States v. Atterson*, 926 F.2d 649, 657 (7th Cir.1991); *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir.1991); *United States v. Caudill*, 915 F.2d 294, 299 (7th Cir.1990); *United States v. McAnderson*, 914 F.2d 934, 949 (7th Cir.1990). "[T]o appeal successfully a motion for severance, a defendant must demonstrate actual prejudice resulting from the denial." *McAnderson*, 914 F.2d at 948; *see also, United States v. Walters*, 913 F.2d 388, 392 (7th Cir.1990); *United States v. Briscoe*, 896 F.2d 1476, 1516 (7th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). In reviewing severance claims based on an assertion that antagonistic defenses were presented at trial, we will reverse a district court only "if the defenses 'conflict to the point of being irreconcilable and mutually exclusive,' so that 'acceptance of one defendant's defense will preclude the acquittal of the other defendant.' " *United States v. Bruun*, 809 F.2d 397, 407 (7th Cir.1987) (quoting *United States v. Shively*, 715 F.2d 260, 267 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984); *United States v. Gironda*, 758 F.2d 1201, 1220 (7th Cir.), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985))

(citations omitted); *see also, McAnderson*, 914 F.2d at 949; *Briscoe*, 896 F.2d at 1518; *United States v. Mazzanti*, 888 F.2d 1165, 1172–73 (7th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 2167, 109 L.Ed.2d 497 (1990); *United States v. Turk*, 870 F.2d 1304, 1306 (7th Cir.1989); *United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th Cir.), *cert. denied*, 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987). Because of the "strong public interest in having persons jointly indicted tried together," *United States v. Oxford*, 735 F.2d 276, 280 (7th Cir.1984), "hostility and finger pointing during the joint trial ... alone [are] insufficient to justify granting a severance." *Bruun*, 809 F.2d at 407.

We conclude that the district court did not abuse its discretion in declining to sever Edward's trial from Seifert's. We observe first that Seifert never testified at trial, limiting the finger-pointing that occurred to comments made or questions posed by Seifert's trial counsel. When Seifert's lawyer commented during his opening and closing arguments that the real villain in the events surrounding Easy Auto's purchase of the village's lot was Edward, Edward objected, and the trial judge reminded the jury that the statements of counsel were neither legal instructions nor evidence. *See* Transcript of first trial ("Tr. 1st"), at 173–74, 3783. Similarly, the district court sustained objections made by Edward when Seifert's lawyer attempted to elicit testimony from others from whom Edward solicited bribes to the effect that they felt coerced into paying, and even barred Seifert's lawyer from pursuing this line of questioning in conferences with counsel held before certain witnesses appeared. *See, e.g.*, Tr. 1st at 426 (Jay Crane); *Id.* at 1457–61 (John Rock). When Seifert's counsel nevertheless began to question one of these witnesses, John Rock, about his fears, Edward's lawyer objected and the district court sustained his objections. *Id.* at 1463, 1465.

We agree with the government that Seifert's theory of the case was never fully developed. The various remarks by Seifert's counsel, though evincing a willful

disregard for the limitations imposed on his questioning by the district court, failed to prejudice Edward to the extent of denying him his right to a fair trial. Edward supports his claim with no more than a handful of comments in the course of a four-week trial. It is possible that a defense so antagonistic as to require dispensing with the judicial economies joint trials create could be presented solely through the arguments and questions of counsel. In such a case, however, the arguments and questions establishing the antagonistic defense would have to amount to more than the isolated incidents to which Edward has pointed us.

Furthermore, the antagonism between Seifert's defense—to the extent it was developed—and Edward's was not so clear as to preclude a jury from believing the representations of Seifert's counsel that his client was coerced while still acquitting Edward. Edward's defense to the mail fraud charges stemming from the Easy Auto scheme was that in lowering the appraisal for the land he had been acting in the best interest of the village by helping business owners who offered to put an otherwise worthless—and tax exempt—piece of land to a commercial use. *See* Tr. 1st at 134. In other words, Edward argued that there was no fraudulent scheme furthered by mailings because there was no fraud victim. This theory of the defense was not so irreconcilable with Seifert's extortion theory as to justify a severance: a jury could have believed that Edward coerced Seifert and Mink into greasing his palm while also concluding that the village was not harmed by Edward's conduct.

This case does not present a Hobbs Act prosecution in which an extortionist's alleged victim is charged with mail fraud or some other offense and defends himself by arguing that he participated in the scheme to defraud because he was threatened with physical harm or economic ruin if he didn't. Shortly before the trial began the government moved to dismiss the count of the indictment charging Edward with extorting a bribe from Seifert "under color of official right." 18 U.S.C. § 1951(b)(2). As Seifert's counsel seemed to recognize in arguing vigorously that the government should

not be allowed to drop the Hobbs Act count relating to the Easy Auto bribe, *see* Tr. 1st at 5–6, once the government dismissed this charge, the mutual antagonism between Seifert's defense and Edward's defense diminished substantially. Because Edward has shown neither that Seifert's defense was sufficiently developed or sufficiently antagonistic to warrant a severance, we hold that the district court did not abuse its discretion in concluding that none was required.

### III. SEVERANCE (MAXINE & EDWARD/OTHER DEFENDANTS)

■ Maxine and Edward argue that they were denied a fair trial when the district court denied their motion to sever their trial on the tax counts from the trial of Edward and his codefendants on the counts arising from Edward's misuse of his official position. They argue that they were swamped by spillover from the evidence of wrongdoing introduced against Edward, Seifert, and Mink, in the Easy Auto, Park Villas, and Village Attorneys schemes. It is undisputed that Maxine did not participate in these events, and that the income the couple derived from Edward's misdeeds generated only a portion of the unreported income alleged in the tax counts. We have already discussed the standard we apply when reviewing severance claims. *Ante at* 1513–14. "A defendant is entitled to severance when the evidence against one defendant cannot be compartmentalized and the jury is likely to consider it to the prejudice of a defendant against whom it is not properly directed." *United States v. Inigo,* 925 F.2d 641, 655 (3d Cir.1991); *see also United States v. Gibbs,* 904 F.2d 52, 56 (D.C.Cir. 1990); *United States v. Williams,* 858 F.2d 1218, 1225 (7th Cir.1988), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989); *United States v. Garner,* 837 F.2d 1404, 1413–14 (7th Cir.1987), *cert. denied,* 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608, 487 U.S. 1240, 108 S.Ct. 2914, 101 L.Ed.2d 945, 488 U.S. 898, 109 S.Ct. 244, 102 L.Ed.2d 232 (1988). Cases in which "the evidence against one defendant is far

more damaging than the evidence against the moving party," *United States v. Long,* 905 F.2d 1572, 1581 (D.C.Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990) (internal quotations and citations omitted), make the process of individually assessing the weight of the evidence as to each defendant particularly difficult, increasing the risk that "the spillover may jeopardize one defendant's right to a fair trial." *Id.; cf. United States v. McAnderson,* 914 F.2d 934, 949 (7th Cir.1990) (recognizing the "danger in complex cases that the taint of the larger actors might spill over onto the smaller ones.").

In *United States v. Anderson,* 809 F.2d 1281, 1288 (7th Cir.1987), we held that the joinder of tax offenses with other counts alleging illegal activity that was the source of unreported income charged in the tax counts was proper, even where the non-tax offenses were not the only source of unreported income. We reiterated this point in *United States v. Hogan,* 886 F.2d 1497, 1507 (7th Cir.1989), writing there that "joinder of a tax claim to another charge, when the underlying charge generated only a portion of the unreported income, does not require *automatic* reversal." (emphasis supplied). *See also United States v. Oakley,* 853 F.2d 551, 554 (7th Cir.1988), *cert. denied,* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 977 (1989).

The joinder rule announced in *Anderson, Hogan,* and *Oakley* disposes of Edward's severance claim. Like the defendants in those cases, he was charged with a variety of non-tax offenses which generated income. His failure to report this income on his federal returns formed in part the basis for his convictions on the tax counts. This is precisely the type of joinder we allowed in *Anderson* and *Hogan.* Moreover, when we observed in *Hogan* that such joinder does not automatically require reversal, we noted that one factor to be examined was the strength of the government's case against the defendant on the non-tax counts. *See Hogan,* 886 F.2d at 1507. This factor militates against Edward's severance argument: the evidence against him on the non-tax counts was compelling. The

*Anderson* rule of joinder in cases involving both income-generating crimes and tax evasion based on the failure to report income derived from these crimes and other income must be employed with care, as the limited endorsement given the rule in *Hogan* suggests. There may be cases in which income derived from the acts charged in the non-tax counts plays only a very small part in the tax charges, or where the evidence presented on the tax counts is insignificant compared to the evidence presented on the non-tax charges. In these cases, a separate trial on the tax charges may well be the most appropriate accommodation between the societal interest in judicial economy and the defendant's right to a trial in which jurors can individually assess the evidence against him on each of the charges in the indictment. Edward has not persuaded us, however, that this is such a case.

██ Maxine's argument that she should have been tried separately on the tax counts presents a more difficult question. Unlike the defendants in *Anderson, Oakley,* and *Hogan,* and unlike her husband Edward, she was not named in the non-tax counts and there was no evidence introduced at trial that she played any part in the acts alleged in these counts and proven at trial. Indeed, for the great majority of the first trial her name came up only in a drumbeat of limiting instructions given during the testimony of the various prosecution witnesses who were questioned concerning their knowledge of the acts alleged in the non-tax charges against Edward, Seifert, and Mink. *See, e.g.,* Tr. 1st at 164, 262, 427, 503, 574, 583, 929, 1091, 1304–05, 1514, 1593, 1602, 1612, 1670, 2409, 2452, 2889, 3020, 3836. We thus share defendants' view that the joinder of Maxine, her husband, and the other co-defendants, and the tax evasion, RICO, Hobbs Act, and other charges, goes beyond what we allowed in *Anderson.* This case thus requires us to examine the scope of the joinder rule we adopted in that case.

We believe that in denying Maxine's motion to sever, the district court approached the outer limits of its discretion in deciding

severance issues. Maxine was a bit player in a trial in which her husband and his codefendants were charged with committing a variety of offenses more serious than the tax charges lodged against her, including, as to her husband, violations of both RICO and the Hobbs Act. For the great majority of a lengthy trial she and her lawyer were spectators, watching as a parade of witnesses testified concerning the various schemes in which her husband, Seifert, and Mink were charged. We are sensitive to the concern, expressed by Maxine's counsel at oral argument, that the numerous limiting instructions the district court gave to remind the jury not to consider certain testimony in determining Maxine's guilt or innocence may have lost their effect through sheer repetition, or may even have piqued the jury's curiosity as to Maxine's role in her husband's various misdeeds. Put simply, not granting Maxine's severance motion in this case tested the ability of jurors not to tar Maxine with the broad brush applied to her husband and his codefendants.

Nevertheless, we affirm Maxine's conviction despite our view that justice would have been better served by trying her on the tax counts (either alone or with her husband) in a separate proceeding. Because Maxine waived her Rule 8 objection to her joinder with Edward, Seifert, and Mink in the indictment,[1] she is limited to asserting a challenge under Rule 14 and must show that the joinder caused her prejudice. *See, e.g., Hogan*, 886 F.2d at 1506 n. 9; *Garner*, 837 F.2d at 1413. We believe that the risk of prejudice caused by jury confusion in this case does not require a reversal in view of the strength of the evidence against Maxine on the tax counts, the small number of codefendants with whom she was tried, and the discrete nature of the testimony against her and her husband on the tax charges, nearly all of which was presented over three consecutive days out of the twenty days of trial.

We note that the jury demonstrated an ability to compartmentalize the evidence presented in the first trial when it acquitted Edward on one count of attempted extortion while finding him guilty on the other charges. Because we presume that this jury was also able to compartmentalize the evidence against Maxine, we affirm her convictions despite our discomfort with the severance ruling that allowed her joint trial.

## IV. SUFFICIENCY OF THE EVIDENCE (EDWARD/MAIL FRAUD)

We now move from Edward's first trial to his second. The acts for which he was tried in the second proceeding concerned a scheme to defraud Cook County. The government alleged that Edward's codefendant, County Administrator Joe Matalone, devised a plan by which Matalone, who leased cars the county needed to transport polling equipment repairers on election days, steered the leasing business to a variety of dummy corporations. Edward owned one of the dummy corporations, which was named Cars–R–Us. Cars–R–Us' sole assets at the time of the events charged in the indictment were a post-office box, a bank account, and invoices. When Cook County placed an order through Cars–R–Us, Cars–R–Us would turn around and rent the cars it needed from Econo–Car, a legitimate Chicago car rental firm. Econo–Car would bill Cars–R–Us, which would invoice Cook County for what it paid Econo–Car, plus a significant profit margin. Edward shared the profits with Matalone.

In his second trial, Edward was tried for five counts of mail fraud arising from the Cars–R–Us scheme. The mailings identified in the indictment were invoices sent from Econo–Car to Cars–R–Us. On appeal, Edward argues that the evidence from his second trial was insufficient to convict him of mail fraud because it failed

---

1. *Cf. United States v. Velasquez*, 772 F.2d 1348, 1352 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986) (Fed.R. Crim.Pro. 8 does not allow joinder of different persons related only by fact of having commit-

ted similar offenses); *United States v. Moya–Gomez*, 860 F.2d 706, 766 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989) (same).

to prove beyond a reasonable doubt that he intended to defraud the county through this scheme. The government responds that Edward's role as an intermediary, paying Econo–Car at a lower rate while invoicing Cook County at a higher rate, establishes an intent to defraud the County.

■ A defendant challenging the sufficiency of the evidence supporting his conviction faces a "formidable" burden

> as we must affirm as long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." In making this determination we look to all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the government. We must affirm unless the record is barren of any evidence, regardless of weight, from which the trier of fact could find guilt beyond a reasonable doubt.

*United States v. Atterson*, 926 F.2d 649, 655 (7th Cir.1991) (citations omitted). "As part of a mail fraud case, the government must prove the defendant's own specific intent to defraud." *United States v. Johnson*, 927 F.2d 999, 1003 (7th Cir.1991); *see United States v. Cosentino*, 869 F.2d 301, 308 (7th Cir.), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989). Intent in a mail fraud case may be proven by direct or circumstantial evidence. *See, e.g., Cosentino*, 869 F.2d at 308; *United States v. Finney*, 714 F.2d 420, 422 (5th Cir.1983).

We agree with the government that reasonable jurors could have concluded from the evidence presented in Edward's second trial that he intended to defraud Cook County by means of the mailings charged in the indictment. The evidence in the second trial featured a series of invoices that Econo–Car mailed to Cars–R–Us. These invoices were matched to invoices submitted by Cars–R–Us to the county. The comparison showed that Cars–R–Us billed the county for substantially more than it paid Econo–Car, even though Cars–R–Us did nothing but generate invoices. The increase, in other words, was not attributable to any service Cars–R–Us performed for the county or Econo–Car. In addition, the government showed that at the time of the scheme between Matalone and Edward, Cars–R–Us was a shell consisting of a postal box and not much more. Rational jurors could well have inferred from this evidence that Edward maintained Cars–R–Us as part of an intentional scheme to defraud the county.

## V. CONCLUSION

We have considered the remaining grounds defendants raise on appeal and find them to be without merit. The convictions of Edward and Maxine Emond are

AFFIRMED.