**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Augustine RAMIREZ and Salvador**
**Ramirez, Defendants–**
**Appellants.**

Nos. 93–4056, 93–4059.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1994.

Decided Jan. 19, 1995.

Barry Rand Elden, Asst. U.S. Atty. and Jonathan King, Asst. U.S. Atty. (argued), Crim. Receiving, Appellate Div., Chicago, IL, for U.S. in No. 93–4056.

Julie L. Friedman, Chicago Heights, IL (argued), for Augustine Ramirez.

Debra Riggs Bonamici, Office of U.S. Atty., Crim. Div., Jonathan King, Asst. U.S. Atty. (argued), Barry Rand Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S. in No. 93–4059.

Jerry B. Kurz (argued), Kathryn Hall, Hall & Kurz, Chicago, IL, for Salvador Ramirez.

Before CUMMINGS, PRATT,* and MANION, Circuit Judges.

MANION, Circuit Judge.

Following a jury trial, Augustine and Salvador Ramirez were convicted of conspiracy and attempt to possess with intent to distribute cocaine. Augustine and Salvador Ramirez appeal. We affirm.

## I. Facts

Augustine Ramirez ("Augustine"), his cousin Salvador Ramirez ("Salvador"), and

* Hon. George C. Pratt, of the Second Circuit, sitting by designation.

Herberto Salcido ("Salcido") conspired to purchase 25 kilograms of cocaine for $150,000 dollars. They agreed to purchase the cocaine from Sergio Garcia ("Garcia") who, along with Domingo Alvarez ("Alvarez"), was cooperating with an undercover narcotics investigation conducted by state and federal law enforcement agents. Augustine, Salvador, and Salcido were arrested during the exchange and, shortly thereafter, were indicted for conspiracy and attempt to possess with intent to distribute cocaine. Salcido entered into a plea agreement; Augustine and Salvador pleaded not guilty, and their case proceeded to trial.

At trial the evidence showed that the negotiations which culminated in the arrest and indictment of Augustine and Salvador began on February 5, 1993, when Salcido approached Garcia and indicated that he and "his people" were interested in purchasing multiple kilograms of cocaine and had about $150,000 cash at hand. On February 7, 1993, Salcido met again with Garcia, who wore a hidden recording device throughout the negotiations that ensued. At this meeting, Salcido indicated that he was working with two other individuals who had the money and, eventually, Salcido and Garcia agreed to exchange the drugs and money the next day.

Salcido did meet with Garcia and Alvarez the next day, but he did not have the money. When Garcia and Alvarez demanded assurances, Salcido told them that the money was coming and then attempted to contact the "money man" from a nearby public telephone. Salcido dialed a number and asked to speak with Augustine Ramirez.

The parties met again in a parking lot at 6:00 that evening. At this meeting, Salcido indicated that he was going to meet with one of his partners at a nearby restaurant. Salcido then drove Garcia to a nearby parking lot where they waited. During this wait, Salcido indicated that his partner's wife was a telephone operator.

Eventually, a brown station wagon registered to Salvador parked nearby. Salcido conversed with the driver and then entered the station wagon, which drove to a Taco Bell located elsewhere in the same parking lot. When Salcido returned about five minutes later, he told Garcia that the money would arrive in another five minutes. While they waited Salcido bragged that he could trust the "money man" because he had known him for 18 years and they had worked together for 12 years.

When the money man failed to arrive on time Salcido drove Garcia back to the Taco Bell where Salvador's station wagon was waiting. Salcido spoke with the driver, who told him that the "money man" would be late. As a result the transaction was postponed again. Later that night Salcido rescheduled the meeting for 3:00 the following afternoon, February 10, 1993.

When they met that afternoon, Salcido told Garcia that the exchange would take place at 6:00 p.m. at a place that belonged to one of his partners. The parties met again at 6:00 p.m. After Salcido placed a call to the "money man" from a public telephone in the parking lot of the Rockford Health Club, he returned to tell Garcia that he had to meet another individual who would accompany them to the exchange. Salcido told Garcia that this individual would be in the same station wagon, and that he was the one who knew where the exchange would take place.

But again the "money man" failed to appear, so Salcido drove Garcia to an apartment at 5801 Garret Lane which was rented by Salvador. While Garcia waited in the car, Salcido knocked at the apartment door, which was opened by Augustine. When Salcido returned to the car about ten minutes later he told Garcia that the money was in the apartment. The two men drove back to the parking lot where Alvarez was waiting in a van with the cocaine.

While Garcia and Salcido were at the Garret Lane apartment, Salvador entered and slowly drove around the parking lot where Alvarez was waiting in the van. When Salcido and Garcia returned, Salcido met with Salvador at a nearby gas station. Salcido then walked back to the van and told Garcia and Alvarez to follow Salvador's station wagon. Salvador and Salcido drove to the apartment at 5801 Garret Lane while Garcia and Alvarez followed in the van.

Upon reaching the apartment, Salvador pulled into the driveway while Garcia and Alvarez parked the van in the street. Garcia and Alvarez approached the apartment door, which was opened again by Augustine. When he entered the apartment, Garcia encountered Salvador in a completely unfurnished living room.

At this point, Salcido asked Augustine to show Garcia the money. Augustine went into another room and returned with a duffel bag which he opened and placed on the living room floor. Inside the duffel bag, Garcia found packages of money. When Garcia asked how much money was in the bag, Augustine told him "One forty," meaning $140,000.00. While the money was being displayed, Salvador stood inside the room looking out the window. Garcia left the apartment and returned to the van, ostensibly to get the cocaine. He reentered the apartment to ask for a bag to conceal the cocaine. Augustine was incredulous, but he went upstairs and returned with a bag for Garcia. Garcia left the apartment.

Augustine's incredulity was confirmed a moment later when law enforcement officers entered the apartment and began arresting the conspirators. Upon entering, one of the officers heard someone running down the stairs. The officer ran down the stairs, through the basement and garage, then outside the apartment. There he saw Augustine, who was arrested in the back yard with no coat and $9,100 stuffed in his pants. Salvador and Salcido were arrested inside.

The police searched the apartment and their prisoners in connection with the arrests. In the process they recovered the duffel bag, which actually contained $159,830 in cash. In the closet of an upstairs bedroom an agent also found 64 pounds of marijuana. The marijuana was not hard to find because the agent could smell it when she was only halfway up the stairs. In a second bedroom she found a semi-automatic pistol and ammunition. When the police searched Augustine, in the inside pocket of his jacket they found a pager, which they later learned had been rented to Salvador. Upon searching Salcido, agents found a business card with the pager's number and the notation "AGUS" written on it.

Augustine, Salvador and Salcido were indicted for conspiracy to possess with intent to distribute multiple kilograms of mixtures containing cocaine in violation of 21 U.S.C. §§ 841 and 846. Initially all three defendants pleaded not guilty, but as trial approached Salcido entered into a plea agreement. Augustine and Salvador went forward.

After the court denied the motions for severance filed by both Augustine and Salvador, the case went to trial. At the trial Garcia testified for the government about the events described above. In addition, the government introduced other evidence which showed that Augustine and Salvador were the co-conspirators Salcido had described to Garcia during their negotiations. Specifically, the government proved that Salcido and Augustine had worked together at a factory from 1977–86, and that Augustine's wife was a telephone operator. The government also proved that three calls had been made on the day of the drug transaction to the pager found in Augustine's pocket from a phone registered to Ignacio Salcido. In addition, the landlord for the apartment at 5801 Garret testified that Salvador was a co-signer on the lease; and the government showed that the other co-signer, Elda Castro, had used Augustine's address when she registered her car (the government introduced her car's title history into evidence). The government also introduced transcripts of Salcido's tape-recorded statements with Garcia, including the conversation in the apartment at 5801 Garret Lane where Augustine told Garcia that there was $140,000 in the duffel bag. This portion of the transcript was admitted at trial only after Garcia testified that Augustine had made this statement. After hearing testimony about the strong smell generated by the 64 pounds of marijuana in the apartment, the court admitted that evidence against both Augustine and Salvador; it also admitted evidence about the gun and ammunition found in the apartment, but only against Salvador.

For the most part, Augustine and Salvador limited their defense to argument. Augus-

tine did present testimony designed to show that he had not told Garcia that there was $140,000 in the duffel bag, however, and argued that he was just resting at Salvador's apartment. According to his wife, Augustine had $9,100 stuffed in his pants so that he could pay an immigration lawyer. Salvador adopted a different strategy: in his closing he argued that while Augustine's participation in the conspiracy was established, the government had not shown that Salvador was a co-conspirator. The jury convicted both Augustine and Salvador. They appeal.

## II. Analysis

Augustine and Salvador challenge their convictions on several grounds. Both argue that the district court abused its discretion when it denied their motions for severance. They also advance a number of separate evidentiary challenges. Augustine argues that the title history to Elda Castro's car, which tied him to the Garret Lane apartment, was inadmissible hearsay. He also argues that the entry in the transcript from the conversation in that apartment, which designated him as the person who told Garcia that there was $140,000 in the duffel bag, was inadmissible hearsay. Salvador argues that evidence about the gun and marijuana found in the Garret Lane apartment was inadmissible character evidence. He also argues that there is insufficient evidence to support his conviction. We consider these contentions in turn.

### A. Severance

 Augustine and Salvador argue that the district court abused its discretion when it denied their motions for severance. A motion to sever the trial of co-defendants is addressed to the sound discretion of the trial court, and the court's decision will not be reversed absent a clear showing of an abuse of discretion. *Zafiro v. United States,* —— U.S. ——, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993); *United States v. Rivera,* 6 F.3d 431, 437 (7th Cir.1993). There is a presumption that co-conspirators who are indicted together are properly tried together. *Rivera,* 6 F.3d at 437; *United States v. Smith,* 995 F.2d 662, 670 (7th Cir.1993).

Where defendants are properly joined under Federal Rule of Criminal Procedure 8(b), a district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *Zafiro,* —— U.S. at ——, 113 S.Ct. at 938.

Moreover, "[s]imple blame-shifting does not necessarily 'prevent the jury from making a reliable judgment about guilt.or innocence.'" *United States v. Goines,* 988 F.2d 750, 781 (7th Cir.1993) (citations omitted). Thus, mutually antagonistic defenses do not automatically require severance because less drastic measures, such as limiting instructions, will often suffice to address any risk that one defendant will be convicted on account of another defendant's actions. *Zafiro,* —— U.S. at —— – ——, 113 S.Ct. at 938-39. As a result, a defendant bears an extremely difficult burden when it tries to show, on appeal, that the district court abused its discretion when it denied a motion for severance. *United States v. Moya–Gomez,* 860 F.2d 706, 754 (7th Cir.1988).

Augustine and Salvador have not shown that the district court abused its discretion when it denied their motions for severance. Their reliance upon the "mutually antagonistic" nature of their defense is belied by the fact that, with the exception of closing argument, there was no finger-pointing. More importantly, the limited and typical blame-shifting that occurred at their trial does not require severance where, as here, the district court gave proper limiting instructions. *See Zafiro,* —— U.S. at ——, 113 S.Ct. at 939; *Rivera,* 6 F.3d at 438; *United States v. Dimas,* 3 F.3d 1015, 1021 (7th Cir.1993); *United States v. Emond,* 935 F.2d 1511, 1514 (7th Cir.1991).

Nor can Salvador show that a disparity of evidence required severance. First, he has not shown that any of the evidence admitted at the trial would be inadmissible if he were tried separately. *See Smith,* 995 F.2d at 670–71. Even if he had made this showing, a disparity of evidence is grounds for severance only if a defendant can show that the jury will be unable to follow the trial court's limiting instructions and give each defendant

separate consideration. *See United States v. Tylkowski,* 9 F.3d 1255, 1263 (7th Cir.1993) ("'the relevant inquiry is whether it is within the jury's capacity to follow the trial court's limiting instructions ...'"); *United States v. Clark,* 989 F.2d 1490, 1500 (7th Cir.1993) (same). Salvador has not made that showing; despite his argument to the contrary, this was not a complex case where many defendants were tried together and had markedly different degrees of culpability.

The remaining arguments for severance advanced by Salvador and Augustine have no merit. Salvador's argument that severance was required because he and Augustine were blood relatives is groundless. He cites no case to support this proposition, and we will not create a *per se* rule requiring severance whenever relatives are tried together. Likewise, Augustine is not entitled to severance just because he had no opportunity to rebut Salvador's closing argument. Augustine has no constitutional or other right to rebut the closing arguments of his co-defendants. Thus, the trial court did not abuse its discretion when it denied the motions for severance offered by Augustine and Salvador.

### B. Evidentiary Challenges

■ As noted, Augustine and Salvador advance several evidentiary challenges. Augustine argues that the title history to Elda Castro's car, which tied him to the Garret Lane apartment, was inadmissible hearsay. He also argues that the entry in the transcript from the conversation in that apartment which designated him as the person who told Garcia there was $140,000 in the duffel bag was inadmissible hearsay. Salvador argues that evidence concerning the gun and marijuana found in the Garret Lane apartment was inadmissible character evidence. We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Mounts,* 35 F.3d 1208, 1214 (7th Cir.1994). "An abuse of discretion occurs only when no reasonable person could take the view of the trial court." *Id.*

### 1. Augustine's evidentiary challenges.

■ Augustine's objection to the admission of the title history for Elda Castro's car is curious. While it is true that there are any number of reasons why Ms. Castro might have used Augustine's address when she registered her car, those competing inferences were for the jury to consider. The title history was properly admitted under Fed.R.Evid. 803(8), the public records exception, and the trial court did not abuse its discretion when it admitted this evidence.

■ Augustine's objection to those portions of the transcript which relate to the discussion in the Garret Lane apartment is also mistaken. Here, Augustine argues that the entry in the transcript which designated him as the person who told Garcia that there was "One forty" (meaning $140,000) in the duffel bag was inadmissible hearsay. Naturally, *Augustine's statement* was nonhearsay because, as the district court properly found, it was the statement of a co-conspirator during the course and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). Similarly, Garcia's in-court attribution of that statement to Augustine is not hearsay; and neither is the entry in the transcript, because it merely reflected Garcia's in-court attribution of that statement to Augustine. Garcia's in-court testimony, not the transcript, was offered to prove the identity of the speaker and, therefore, the designation in the transcript was simply demonstrative evidence designed to aid the jury. *See United States v. Briscoe,* 896 F.2d 1476, 1490–91 (7th Cir. 1990); *United States v. Alvarez,* 860 F.2d 801, 812 (7th Cir.1988).[1]

### 2. Salvador's evidentiary challenges.

■ Salvador contends that evidence about the marijuana and gun was inadmissible character evidence. He also claims that the evidence was unduly prejudicial, such that its admission was barred by Fed.R.Evid. 403. But Salvador has not shown that the

---

1. It is not clear from the record whether it was Garcia who identified Augustine's voice in the first instance. But, if he did, then this identification would fit within the definition of nonhearsay contained in Fed.R.Evid. 801(d)(1)(C). In *Alva-*

*rez,* we tested the government's voice identification procedures against the constitutional standards applicable to other forms of identification treated under this category of nonhearsay. *Alvarez,* 860 F.2d at 809–12.

district court abused its discretion when it admitted this evidence.

■ The trial court admitted evidence about the marijuana found in Salvador's apartment on the theory that it was "intricately related" to the events which led to Salvador's arrest and indictment. Under the "intricately related" doctrine, evidence of uncharged criminal *activity* is admissible, *even if it does not satisfy the requirements of Fed.R.Evid. 404(b),* if that evidence is "intricately related to the facts of the case" before the court. *United States v. Hargrove,* 929 F.2d 316, 320 (7th Cir.1991); *see also United States v. Elder,* 16 F.3d 733, 737 (7th Cir. 1994). On appeal, Salvador argues that evidence concerning the 64 pounds of marijuana was not intricately related to the cocaine conspiracy for which he was charged. Therefore, he argues, the evidence about the marijuana was evidence of other crimes, wrongs, or acts, that could only be admitted if it satisfied the requirements for admission under Fed.R.Evid. 404(b).

Salvador's argument is unavailing, however, because this court has never held that evidence of uncharged crimes cannot be admitted under under the "intricately related" doctrine. Rather, the question is whether the evidence is properly admitted to provide the jury with a "complete story of the crime [on] trial," *United States v. Roberts,* 933 F.2d 517, 520 (7th Cir.1991) (internal quotations omitted, brackets in the original), whether its absence would create a "chronological or conceptual void" in the story of the crime, *see United States v. Hattaway,* 740 F.2d 1419, 1424–25 (7th Cir.1984); *United States v. Adamo,* 882 F.2d 1218, 1234 (7th Cir.1989), or whether it is "so blended or connected" that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime. *United States v. Bucey,* 876 F.2d 1297, 1315 (7th Cir.1987). Thus, cases applying the "intricately related" doctrine have recognized that evidence concerning the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime, is not evidence of "other acts" within the meaning of Fed.R.Evid. 404(b). *See United States v. Zarnes,* 33 F.3d 1454, 1469 (7th Cir.1994) (evidence of drug transactions completed before conspiracy began was intricately related to conspiracy case because it showed how the relationship between the parties began and blossomed into the charged conspiracy); *United States v. Diaz,* 994 F.2d 393, 395 (7th Cir.1993) (same); *Hilgeford,* 7 F.3d 1340, 1345–46 (7th Cir. 1993) (evidence of defendant's litigation concerning ownership of farm lost in foreclosure was intricately related to subsequent prosecution for filing false tax returns where knowledge of nonownership was at issue); *Hargrove,* 929 F.2d at 320 (evidence concerning pager, cash, and drug reaction of dog when car was searched was intricately related to conspiracy, even where defendant was arrested 10 months after end of charged conspiracy); *Roberts,* 933 F.2d at 519–20 (evidence that police saw defendant throw weapon away during attempted getaway from foiled drugstore hold-up was intricately related to prosecution for armed bank robbery and illegal possession of a firearm two days earlier).

In this case, evidence about the marijuana was properly considered "intricately related to the facts" which gave rise to Salvador's indictment. *See Hargrove,* 929 F.2d at 320. The marijuana was found in Salvador's apartment as part of the search incident to his arrest, and the evidence was directly relevant to his claim that he was an innocent bystander rather than a member of the conspiracy. *See, e.g., Elder,* 16 F.3d 733, 737 (7th Cir. 1994) (evidence that defendant possessed shotgun on prior occasions intricately related to charge of possession on a specific date, *especially where defendant asserted that he was only in momentary possession of the shotgun on the date charged for the purpose of turning in the weapon*). The evidence was also directly relevant to the government's claim that Salvador participated in the conspiracy by allowing his apartment to be used as a "safe house" where the drug transaction could be consummated. *See United States v. Angulo–Lopez,* 7 F.3d 1506, 1511 (10th Cir.1993) (owners of safe houses had an integral role in cocaine conspiracy); *United States v. Crespo De Llano,* 838 F.2d 1006, 1017 (9th Cir.1987) (statement that defendant's apartment was used as safe house

was properly considered in furtherance of cocaine conspiracy). In short, the evidence about the marijuana gave the jury a more, not less, accurate picture of the circumstances surrounding Salvador's arrest and the charged crime. This was not the introduction of evidence concerning acts wholly unrelated to the case which the prohibition of character evidence contained in Fed.R.Evid. 404(b) is designed to prevent. Rather, it evidenced Salvador's role as a facilitator who provided a safe location for the drug transaction: a location obviously used to facilitate other drug transactions as well.

Salvador also argues that the evidence concerning the marijuana was unduly prejudicial and should have been excluded under Fed. R.Evid. 403. Evidence that is intricately related to the facts of the case is admissible so long as it satisfies Fed.R.Evid. 403. *Hargrove,* 929 F.2d at 320; *Elder,* 16 F.3d at 737. We agree with the trial court that the probative value of this evidence outweighed any risk of unfair prejudice. The evidence directly addressed Salvador's argument that he was an innocent bystander to the drug transaction, and its probative value far outweighed any chance that the jury would convict Salvador for dealing marijuana as opposed to conspiring with Augustine and Salcido to purchase 25 kilograms of cocaine. The district court did not abuse its discretion when it admitted this evidence.

 Similarly, the trial court did not abuse its discretion when it admitted evidence about the pistol found in the apartment. Here, the trial court admitted evidence about the gun under the "tools of the trade" theory. *See United States v. Nava–Salazar,* 30 F.3d 788, 798 (7th Cir.1994). And this court has recognized that weapons are tools of the narcotics trade such that this evidence is admissible. *Alvarez,* 860 F.2d at 829–30. Salvador's argument that the gun was too remote to be a "tool of the trade" defies common sense and precedent. *See Alvarez,* 860 F.2d at 830 (gun found under bedroom mattress is properly admitted as tool of the trade); *United States v. Rush,* 890 F.2d 45, 49 (7th Cir.1989) (rejecting argument that gun hidden in defendant's car could not be considered a tool of the trade

because the defendant was not in the car at the time of his arrest). The district court did not abuse its discretion when it admitted evidence concerning the semi-automatic pistol and ammunition found in Salvador's apartment.

### C. Salvador's Sufficiency Challenge

 Salvador's assertion that there is insufficient evidence to show that he was a part of the conspiracy is also untenable. A conspiracy is a combination of two or more persons for the purpose of committing a criminal act by their joint action. *United States v. Aguilar,* 948 F.2d 392, 395 (7th Cir.1991). There must be "substantial evidence" that a particular defendant knew about the conspiracy's illegal objective and agreed to participate in the conspiracy. *United States v. Burrell,* 963 F.2d 976, 987 (7th Cir.1992). Substantial evidence exists when there is evidence of sufficient quantity and quality to support the jury's verdict. *United States v. Auerbach,* 913 F.2d 407, 414 n. 6 (7th Cir.1990).

 In an appellate challenge to the sufficiency of the evidence supporting a criminal conviction, the defendant "faces a nearly insurmountable hurdle." *United States v. Teague,* 956 F.2d 1427, 1433 (7th Cir.1992). On appeal, this court views the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government, and will reverse a conviction only if no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Goines,* 988 F.2d at 758. This court will not reweigh the evidence or make any credibility determinations. *Id.*

The record contains evidence sufficient to allow a rational trier of fact to find that Salvador agreed with Augustine and Salcido to purchase cocaine for the purpose of distribution. Salvador's station wagon was involved in the abortive transaction that took place on February 8, 1993. Further, on the day of the transaction Salvador slowly drove his station wagon through the parking lot where Alvarez was waiting, as if checking for surveillance. He then proceeded to a gas station. When Salcido returned from his stop at the Garret Lane apartment, Salcido

went directly to that gas station to meet with Salvador, as if they planned to rendezvous there. Then Salvador drove Salcido back to the apartment after Salcido told Garcia and Alvarez to follow the station wagon. Once they got to the apartment, Salvador looked out the window; that is, he kept a "look-out."

Salcido also made several statements which show that Salvador was a co-conspirator. Throughout the negotiations and arrangements Salcido made several references to the "guy in the station wagon" as if the same person who drove the station wagon on February 8, would be in the car on February 10, 1993, the day of the transaction and arrests. On that day, Salcido said he had to meet someone in the parking lot, and he also said that the exchange would occur at a place that belonged to one of his partners; Salcido met with Salvador, and they went to Salvador's apartment. In that apartment the police found 64 pounds of marijuana and a semi-automatic pistol with ammunition. Police also found a pager rented to Salvador in Augustine's jacket, and Salcido, who negotiated the drug deal, had that pager's number and Augustine's name written on a business card in his pocket. This evidence is more than sufficient to support Salvador's conviction. *See, e.g., United States v. Brigham,* 977 F.2d 317, 318–20 (7th Cir.1992) (evidence that lookout showed up on short notice with a co-conspirator and remained at scene throughout a drug deal was sufficient to support conviction); *see also Burrell,* 963 F.2d at 989–90; *United States v. Romo,* 914 F.2d 889, 899–900 (7th Cir.1990).

### III. Conclusion

The district court did not abuse its discretion when it denied the motions for severance filed by Augustine and Salvador. Nor did the district court abuse its discretion when it admitted into evidence the title history of Elda Castro's car, transcripts of the tape-recorded conversation that reflected Garcia's in-court identification of Augustine as the person who told him that there was $140,000 in the duffel bag, or evidence of the marijuana, semi-automatic pistol and ammunition found in Salvador's apartment. There is also sufficient evidence to support Salvador's conviction for conspiracy and attempt to possess with intent to distribute multiple kilograms of mixtures containing cocaine.

For the foregoing reasons, we

AFFIRM.